

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division**

PRO-CONCEPTS, LLC,

        Plaintiff,

v.                           Civil Action No. 2:12cv573

TIMOTHY MARK RESH,

        Defendant.

## OPINION AND ORDER

This matter is before the Court on a "Motion for Preliminary Injunction," filed by plaintiff, and a "Motion to Deny Preliminary Injunction," filed by defendant, which the Court will address as a response in opposition, as well as "Motions for Ruling" on both of these motions from their respective parties requesting ruling on their pending motions. Plaintiff's written request for a preliminary injunction pending the outcome of this case is predicated on the alleged offending use of plaintiff's trademark through a website, cybersquatting through registration and use of that website, and conversion of plaintiff's software product by Timothy Mark Resh ("Resh" or "Defendant") in breach of the employment contract between plaintiff and defendant. Pro-Concepts, LLC ("Pro-Concepts" or "Plaintiff") requests that the Court issue a Preliminary Injunction ordering Resh to: (1) cease selling, offering for sale, distributing, marketing, telemarketing, advertising and/or

placing advertising, and/or promoting a website or services that use any designs or marks confusingly similar to or which would dilute Pro-Concepts' RISK RADAR mark ("Mark"); (2) immediately transfer ownership and control in the website www.riskradarenterprise.com to Pro-Concepts; (3) return any and all copies of software programs belonging to Pro-Concepts, including any copies of Risk Radar Enterprise and any related electronic data; and (4) cease any and all use of Risk Radar software and any other materials, electronic or otherwise, belonging to Pro-Concepts.    Following notification to Resh regarding the preliminary relief sought by plaintiff and receipt of Resh's responsive motion to deny preliminary injunction, the Court conducted a hearing on their motions.    For the reasons stated below, plaintiff's motion seeking a preliminary injunction is **DENIED**, pending the outcome of this case.

## I.    FACTUAL[1] AND PROCEDURAL BACKGROUND

Defendant Resh is a former employee of Plaintiff Pro-Concepts, LLC.    Prior to beginning his employment with Pro-Concepts, Resh worked for American Systems Corporation ("ASC") in the development of the Risk Radar software.    Risk Radar2012 and Risk Radar Enterprise are project management software sold and licensed by Pro-Concepts to governmental and private

---

[1] The facts reproduced here are merely preliminary facts and do not represent factual findings for any purpose other than the resolution of the instant motion.

2

organizations.  Mem. in Supp. of Mot. for Prelim. Inj. ¶7, ECF
No.  4.  Risk  Radar2012  is  a  self-contained,  browser-based
program designed to facilitate proactive risk management.  Id.
Risk Radar Enterprise is a web-based software program used by
government and private sector project managers to identify,
analyze, track, mitigate, and control potential project risk.
Id.

        During  Resh's  employment  with  ASC,  Resh  acquired  the
website at issue, www.riskradarenterprise.com (hereinafter "RRE
website"), independently of ASC for the purpose of protecting
the Risk Radar product.  Prelim. Inj. Tr. 17 & 51, ECF No. 20
(hereinafter, "Tr. __").  After acquiring the website, Resh
requested reimbursement from ASC for the registration of the RRE
website and ASC denied reimbursement and further instructed Resh
that, due to ASC's policy of maintaining one website for all
their services, he was not to link or redirect the RRE website
to the official ASC website.  Tr. 52-53.

        Resh was hired as an employee by Pro-Concepts to program
the annual updates for the Risk Radar software in January 2012.
Resh  and  Dennis  Edwards,  another  ASC  employee  that  was
transferring to Pro-Concepts, were responsible for copying and
bringing over the Risk Radar source code and associated files to
the "development box" at Pro-Concepts.  After Resh began working
at Pro-Concepts, he set up a redirect on the RRE website to the

3

Pro-Concepts' official website. There is also evidence of discussions regarding the potential transfer of the RRE website to Pro-Concepts, but no agreement between the parties was ever reached.

Pro-Concepts filed the instant action on October 19, 2012 asserting seven counts against Resh. Pro-Concepts' Complaint alleges causes of action for Trademark Infringement (Count I), False Designation of Origin under 15 U.S.C. § 1125(A) (Count II), Cybersquatting under 15 U.S.C. § 1125(d) (Count III), Unfair Competition under Virginia law (Count IV), Trademark Dilution under Virginia law (Count V), Breach of Contract (Count VI), and Conversion (Count VII). See, Compl., ECF No. 1. That same day, Pro-Concepts separately moved for a preliminary injunction, based on Counts I, III, VI, and VII of the Complaint, requiring Resh to (1) cease selling or otherwise promoting a website or services that use any designs or marks confusingly similar to or dilutive of Risk Radar; (2) immediately transfer ownership and control of the RRE website to Pro-Concepts; (3) return any and all copies of software programs belonging to Pro-Concepts; and (4) cease any and all use of Risk Radar software or any other materials belonging to Pro-Concepts. See, Mot. for Prelim. Inj., ECF No. 3.

Resh twice moved for an extension of time to file an Answer, but, as neither motion sought an extension of time to

4

file a response to Pro-Concepts' motion for preliminary injunction, Resh failed to respond timely to that motion. However, Resh did file a separate motion to deny the injunction on January 15, 2013. As Resh is proceeding pro-se, the Court is required to construe his filings liberally.[2]  The Court will treat his motion to deny injunction as a response in opposition. The Court held a hearing on Pro-Concepts' motion for preliminary injunction on Wednesday, January 16, 2013 at 1:30 p.m. where each side presented testimony and offered argument in support of their respective positions. At the conclusion of the hearing, the Court took Pro-Concepts' motion under advisement and directed the parties to a settlement conference before a Magistrate Judge.

On January 23, 2013, Resh filed his Answer to the Complaint in which he asserted twenty-two (22) affirmative defenses, including failure to state a claim upon which relief can be granted, and seven counterclaims. ECF No. 16.  On January 28, 2013, the parties attended a settlement conference before Magistrate Judge Prince. The case did not settle, but as Pro-Concepts represented to the Court in their motion to stay filed

---

[2] "As the Court unanimously held in <u>Haines v. Kerner</u>, a pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers' and can only be dismissed for failure to state a claim if it appears '"beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."'" <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976). (quoting <u>Haines v. Kerner</u>, 404 U.S. 519, 520-521 (1972))(internal citations omitted).

on January 30, 2013, the parties agreed to continue the settlement discussions over the ten (10) days following the settlement conference. ECF No. 17. This Court granted the Agreed Order on Pro-Concepts' motion to stay on January 30, 2013 and stayed the case for ten (10) days. ECF No. 18. However, on February 8, 2013, Pro-Concepts filed a motion for ruling on its motion for preliminary injunction, "[b]ecause the harms described by [Pro-Concepts] in its Motion … continue and the issues described therein remain unresolved." Mot. for Ruling on Prelim. Inj. ¶10, ECF. No. 19.

On February 19, 2013, Pro-Concepts filed a motion to dismiss Resh's counterclaims for failure to state a claim under Federal Rule of Civil Procedure 12(b) and to strike such claims pursuant to Rule 12(f). ECF No. 21. The next day, Resh filed a motion for ruling on his motion to deny injunction. ECF No. 23.

Then, on February 27, 2013, Resh filed a motion to dismiss based on representations Pro-Concepts' counsel made at the settlement conference. ECF No. 24. Pro-Concepts responded to Resh's motion to dismiss on March 7, 2013 and Resh has not filed a reply to this response. ECF No. 25. On March 21, 2013, Pro-Concepts requested a hearing on both pending motions to dismiss. ECF No. 26. Subsequently, the Court issued a second order directing the parties to appear at a settlement conference

before a Magistrate Judge on April 1, 2013. The Court then held a telephonic status conference with the parties upon their request on May 7, 2013.

Having received such written filings, oral testimony, and oral argument, and having given the parties sufficient time to try to resolve their dispute in settlement conferences, this matter is now ripe for decision.

## II. PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011) (quoting Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008)); see Peterson v. National Telecommunications & Information Admin., 505 F. Supp. 2d 313, 317 (E.D. Va. 2006) (quoting Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 811 (4th Cir. 1992)) (recognizing that "[a] preliminary injunction is 'an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied only in the limited circumstances which clearly demand it'"). In order to obtain the extraordinary remedy of a preliminary injunction, the moving party must establish: (1) "that he is likely to succeed on the merits"; (2) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "that the balance of

equities tips in his favor"; and (4) "that an injunction is in the public interest." Dewhurst, 649 F.3d at 290 (internal quotation marks and citations omitted). In Dewhurst, after setting forth the above four-part test, the United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") separately highlighted the fact that controlling precedent from the Supreme Court of the United States ("Supreme Court") requires that a plaintiff "clearly show" that she is likely to succeed on the merits. Id. (quoting Winter, 555 U.S. at 22) (emphasis added); see Direx Israel, 952 F.2d at 812 (indicating that the moving party bears the burden of demonstrating the propriety of a preliminary injunction). The Fourth Circuit has also reiterated the Supreme Court's rejection of a preliminary injunction standard which "allowed the plaintiff to demonstrate only a 'possibility' of irreparable harm" as "'inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.'" Real Truth About Obama, Inc. v. Fed. Election Com'n, 575 F.3d 342, 346-47 (4th Cir. 2009), vacated on other grounds, 559 U.S. 1089 (2010) (quoting Winters 555 U.S. at 22).

The demanding standard outlined above becomes even more exacting when a plaintiff seeks a preliminary injunction that mandates action, as contrasted with the typical form of

8

preliminary injunction that merely preserves the status quo pending trial. See East Tennessee Natural Gas Co. v. Sage, 361 F.3d 808, 828 (4th Cir. 2004) (quoting Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980)) (noting that "'mandatory preliminary injunctions do not preserve the status quo and normally should be granted only in those circumstances when the exigencies of the situation demand such relief'"). As recently explained by the Fourth Circuit:

> Ordinarily, preliminary injunctions are issued to "protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." In re Microsoft Corp. Antitrust Litig., 333 F.3d 517, 525 (4th Cir. 2003). Movant, however, seeks to alter the status quo by having a federal court order the Board to include his name on a primary election ballot. But such "[m]andatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." Id. (citation omitted). Consequently, our "application of th[e] exacting standard of review [for preliminary injunctions] is even more searching when" the relief requested "is mandatory rather than prohibitory in nature." Id.

Perry v. Judd, 471 Fed. Appx. 219, 223-224 (4th Cir. 2012). "Therefore, 'a mandatory preliminary injunction must be necessary both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind.'" W. Indus.-N., LLC v. Lessard, No. 1:12cv177, 2012 WL 966028 at *1 (E.D. Va. Mar. 21, 2012)

9

reconsideration denied, 2012 WL 2046502 (E.D. Va. June 5, 2012)
(quoting Microsoft, 333 F. 3d at 526).

## III. DISCUSSION

On October 19, 2012, Pro-Concepts filed a motion seeking a
"mandatory" preliminary injunction, based on Pro-Concepts'
claims of trademark infringement, cybersquatting, breach of
contract, and conversion, respectively Counts I, III, VI, and
VII of the Complaint. The preliminary injunction sought would
require Resh to (1) cease selling or otherwise promoting a
website or services that use any designs or marks confusingly
similar to or dilutive of Risk Radar; (2) immediately transfer
ownership and control of the RRE website to Pro-Concepts; (3)
return any and all copies of software programs belonging to Pro-
Concepts; and (4) cease any and all use of Risk Radar software
or any other materials belonging to Pro-Concepts. See, Mot. for
Prelim. Inj., ECF No. 3.

As the party seeking preliminary injunctive relief, Pro-
Concepts bears the burden of clearly establishing that the four-
prong test is satisfied.[3]   The Court begins such analysis by

---

[3] Pro-Concepts has suggested at various places in its brief that the
Court may presume irreparable injury or likelihood of success on the
merits.   Although such presumptions were previously available in this
Circuit, the Supreme Court's ruling in Winter that the moving party
must clearly show that it is entitled to preliminary injunctive relief
did away with such presumptions.   See Real Truth About Obama, Inc. v.
Fed. Election Com'n, 575 F.3d 342, 346-47 (4th Cir. 2009), vacated on
other grounds, 559 U.S. 1089 (2010).

10

carefully considering whether Pro-Concepts has clearly demonstrated a likelihood of success on the merits of such claims, as required by the controlling precedent cited above.

## A. Likelihood of Success

The first hurdle that Pro-Concepts must overcome in order to obtain a preliminary injunction is demonstrating a likelihood of success on the merits of plaintiff's asserted claims. Dewhurst, 649 F.3d at 290. "In general, where multiple causes of action are alleged, a plaintiff need only show likelihood of success on one claim to justify injunctive relief." Western Indus.-North, LLC v. Lessard, No. 1:12cv177, 2012 WL 966028, at *2 (E.D. Va. Mar. 21, 2012) (citing McNeil-PPC v. Granutec, Inc., 919 F. Supp. 198, 201 (E.D.N.C. 1995)). But, "in cases where the request for preliminary relief encompasses both an injunction to maintain the status quo and to provide mandatory relief, as here, the two requests must be viewed separately, with the request for mandatory relief being subjected to a more exacting standard of review." Id. (quoting Cornwell v. Sachs, 99 F. Supp. 2d 695, 703 (E.D. Va. 2000)).

In this case, the relief Pro-Concepts seeks in conjunction with its claim of trademark infringement, request (1), is prohibitive in nature as it would prevent Resh from continuing to use the Risk Radar or any confusingly similar marks.  The relief sought based on Pro-concepts' claim of conversion,

11

request (4), is also prohibitive in nature as it would prevent Resh from continuing to use the Risk Radar software or any other materials belonging to Pro-Concepts. The remaining relief requested, requests (2) and (3), which are based on the claims of cybersquatting, and breach of contract and conversion respectively, is clearly mandatory in nature. Thus, requests (1) and (4) which are associated with the claims of trademark infringement and conversion respectively, must be viewed separately from the requests for mandatory relief, which are subject to the more exacting standard of showing extraordinary circumstances in which denial of a preliminary injunction would not only result in irreparable harm but prevent the court from ultimately being able to order relief on the merits. Id. at *1. However, Pro-Concepts must still clearly show that it is likely to succeed on the merits as to all four of the underlying claims in order to obtain the relief sought in its entirety.

### 1. Count I—Trademark Infringement

To prevail on a trademark infringement claim under the Lanham Act, Pro-Concepts must show (1) that it had a valid, protectable trademark, and (2) "that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." Synergistic Intern., LLC v. Korman, 470 F.3d 162, 171 (4th Cir. 2006) (quoting Lone Star Steakhouse

& Saloon, Inc. v. Alpha of Va., Inc., 43 F.3d 922, 930 (4th Cir. 1995)).

### (i) Valid, Protectable Mark

"A certificate of registration of a mark ... [is] prima facie evidence of the validity of the registered mark." 15 U.S.C. § 1057(b); see also Retail Servs., Inc. v. Freebies Publ'g, 364 F.3d 535, 542 (4th Cir. 2004). As Pro-Concepts has attached to the Complaint both the Certificate of Registration for Risk Radar and the assignment by which it obtained sole rights to Risk Radar as well as an affidavit from its president swearing that the trademark is subsisting and unrevoked, Pro-Concepts has shown that it has a valid mark. Compl. Ex. 1 & 2; O'Rourke Aff. ¶ 7. Having established that Pro-Concepts has a valid trademark, the Court next examines whether that mark is protected.

The protection afforded a trademark is directly related to the mark's distinctiveness. U.S. Search, LLC v. U.S. Search.com, Inc., 300 F.3d 517, 523 (4th Cir. 2002). Accordingly, "[t]o ascertain whether a mark is protected, [the Court] must determine whether [the mark] is 1) generic, 2) descriptive, 3) suggestive or 4) arbitrary or fanciful." Id. A generic mark is one that serves as "the common name for a product or service" and is subsequently ineligible for protection because "the public has an inherent right to call a

13

product or service by its generic name." Id. However, a certificate of registration from the PTO is prima facie evidence that the mark is not generic in the eyes of the relevant public. Retail Servs., Inc., 364 F.3d at 542.

Pro-Concepts does not argue that Risk Radar is a fanciful or arbitrary mark,[4] thus the Court need only consider whether Risk Radar is a suggestive mark or a descriptive mark. A suggestive mark uses "words that connote, rather than describe some quality or characteristic of a product or service." Id. Suggestive marks "suggest[] a characteristic of a product, permitting a consumer to infer something about the product from the mark." Hunt Masters, Inc. v. Landry's Seafood Restaurant, Inc., 240 F.3d 251, 254 (4th Cir. 2001). Like fanciful and arbitrary marks, suggestive marks "are inherently distinctive, and thus receive the greatest protection against infringement." Id. (citing Sara Lee Corp. v. Kayser-Roth Corp., 81 F.3d 455, 464 (4th Cir. 1996)). On the other hand, a descriptive mark "is not inherently distinctive." Sara Lee Corp., 81 F.3d at 464. Rather, a descriptive mark "merely describe[s] a function, use, characteristic, size, or intended purpose of the product." Id. (citing Coca-Cola as the "paradigm" of a descriptive mark). A descriptive mark is

---

[4] A fanciful mark consists of "made-up words expressly coined to serve as trade or service marks." U.S. Search, 300 F.3d at 523. An arbitrary mark is one using "common words in unfamiliar ways." Id.

14

eligible for protection "only if it has acquired a 'secondary meaning' in the minds of the public." U.S. Search, 300 F.3d at 523. A mark has acquired a "secondary meaning" if "a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 125 (4th Cir. 1990); see also George & Co. LLC v. Imagination Entm't Ltd., 575 F.3d 383, 394 (4th Cir. 2009) (setting forth six factors for a court to consider when assessing the acquisition of secondary meaning). Generally speaking, courts have drawn the following distinction: "[I]f the mark imparts information directly, it is descriptive. If it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive." George & Co, 575 F.3d at 394 (quoting Pizzeria Uno Corp. v. Temple, 747 F.2d 1522, 1528 (4th Cir. 1984)).

A certificate of registration from the PTO provides prima facie evidence that a mark "at a minimum is descriptive and has obtained secondary meaning." Retail Servs., 364 F.3d at 542. Thus, Pro-Concepts' Risk Radar mark is, at least, a protectable descriptive mark. Pro-Concepts argues that Risk Radar is at least a suggestive mark, because the mark, Risk Radar, does not describe the services provided and because the PTO allowed

registration of Risk Radar without a claim of secondary meaning. See Pizzaria Uno, 747 F.2d at 1528-29 (noting that if a mark's registration is refused because it is descriptive, the applicant can secure registration by asserting and proving that the mark has acquired a secondary meaning but that if "the Patent and Trademark Office finds the mark suggestive . . ., it will grant registration without requiring proof of secondary meaning."). See also, George & Co., 575 F.3d at 395 (citing Lone Star, 43 F.3d at 934) ("If the USPTO believes a mark is descriptive, the registrant must provide evidence of secondary meaning before the USPTO will grant registration.")   Additionally, Defendant Resh has not provided evidence to rebut this presumption.   Retail Servs. 364 F.3d at 542 ("The presumption of validity flowing from trademark registration . . . has a burden-shifting effect, requiring the party challenging a registered mark to produce sufficient evidence to establish that the mark is generic by a preponderance of evidence.")   Thus, Pro-Concepts' Risk Radar mark is suggestive and as such "receive[s] the greatest protection against infringement."   Hunt Masters, 240 F.3d at 254.

### (ii) Likelihood of Confusion

To show that it is entitled to relief based on its claim of trademark infringement, Pro-Concepts must also show that Resh's "use of a colorable imitation of the trademark is likely to

16

cause confusion among consumers." Synergistic Intern., 470 F.3d at 171. The Fourth Circuit has set forth nine factors governing this inquiry:

(1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

George & Co., 575 F.3d at 393. These judicially created factors are not exhaustive or mandatory. Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 154 (4th Cir. 2012). "Not all of these factors are of equal importance, 'nor are they always relevant in any given case.'" George & Co., 575 F.3d at 393 (quoting Anheuser-Busch, Inc. v. L & L Wings, Inc., 962 F.2d 316, 320 (4th Cir. 1992)). "Rather, the confusion 'factors are only a guide – a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion.'" Rosetta Stone, 676 F.3d at 154 (quoting Anheuser-Busch, 962 F.2d at 320)).

In some cases, there is a presumption of likelihood of consumer confusion. Such presumption "arises from the 'intentional copying' of plaintiff's trade dress or trademark by a defendant." Id. at 160 n.5. The presumption applies "only

17

when the copier intends to exploit the good will created by an already registered mark." Id. (quoting Shakespeare Co. v. Silstar Corp. of Am., Inc., 110 F.3d 234, 239 (4th Cir. 1997)). Accordingly, where one party intentionally copies or adopts another's mark in an effort to pass off its own goods or services as those of the mark owner, the presumption is appropriately applied. Id. However as Resh is using neither the mark "Risk Radar" nor the RRE website in any commercial manner, this presumption does not apply to the instant case. The Court thus considers the relevant factors enumerated above.

## (1) Strength of the Mark

"Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of the mark." George & Co., 575 F.3d at 393. In evaluating the strength of a plaintiff's mark, a court should consider both the conceptual strength and the commercial strength. Id. Conceptual strength is determined, in part, by which category of distinctiveness the mark falls into. Id. As discussed above, Risk Radar is a suggestive mark and thus, a conceptually strong mark. However, the strength of a mark for purposes of a likelihood of confusion inquiry "ultimately depends on the degree to which the designation is associated by prospective purchasers with a particular source," thus, commercial strength is the dispositive factor. Id. at 396.

18

Commercial strength is "a concept similar to the 'secondary meaning' inquiry considered in evaluating the mark's validity." Id. at 395. Secondary meaning and, by extension, "[t]he commercial-strength inquiry . . . looks at the marketplace." CareFirst of Maryland, Inc. v. First Care, P.C., 434 F.3d 263, 269 (4th Cir. 2006). "Secondary meaning exists if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise." Perini Corp. v. Perini Const., Inc., 915 F.2d 121, 125 (4th Cir. 1990) (quoting Food Fair Stores, Inc. v. Lakeland Grocery Corp., 301 F.2d 156, 160-61 (4th Cir.), cert. denied, 371 U.S. 817 (1962)). The Court is required to consider six factors in assessing the acquisition of secondary meaning in a commercial strength analysis: "(1) the plaintiff's advertising expenditures; (2) consumer studies linking the mark to a source; (3) the plaintiff's record of sales success; (4) unsolicited media coverage of the plaintiff's business; (5) attempts to plagiarize the mark; and (6) the length and exclusivity of the plaintiff's use of the mark." George & Co., 575 F.3d at 395 (citing Perini, 915 F.2d at 125).

Pro-Concepts has argued only the conceptual strength of its Risk Radar mark. Although it appears to have a conceptually strong mark (in that a suggestive mark is generally entitled to

19

the greatest protection from infringement), there is no evidence before the Court concerning the commercial strength of the mark. A mark's lack of commercial strength "renders the mark weak for purposes of [the] strength of the mark analysis." George & Co., 575 F.3d at 396 (noting that even a suggestive mark may be weak for purposes of the likelihood of confusion factor if commercial strength is lacking). Despite evidence of the conceptual strength of the Risk Radar mark, the lack of evidence, or even argument, regarding commercial strength means the overall strength of the mark is weak.

## (2) Similarity of the Marks

In assessing the similarity of the marks under the second factor, the Court should consider the marks as a whole, rather than their component parts. Sweetwater Brewing Co. v. Great Am. Restaurants, Inc., 266 F. Supp. 2d 457, 462 (E.D. Va. 2003). In so doing, the Court should "focus on the dominant portions of the parties' marks." George & Co., 575 F.3d at 396. See, Lone Star, 43 F.3d at 396; Pizzeria Uno, 747 F.2d at 1534-35. Specifically, the Court is to "focus on whether there exists a similarity in sight, sound, and meaning which would result in confusion." George & Co., 575 F.3d at 396. Pro-Concepts argues that "Risk Radar" is the dominant part of its mark and that Resh's use of the mark in "Risk Radar Enterprises" is sufficiently similar for purposes of the Court's inquiry. ECF

20

No. 4 at 15 (citing Sweetwater Brewing Co., 266 F. Supp. 2d at 463 for the proposition that when a single unitary word is in contention, "any prominent use of the word will necessarily be similar to the trademark, regardless of the surrounding tradedress.")). The RRE website and its URL use the phrase "risk radar enterprise," which predominantly consists of the trademark "Risk Radar" and thus looks and sounds very similar to the mark. The phrase "risk radar enterprise" is used prominently as well, appearing in large lettering at the top of the website. Based on the prominent use of the mark in the RRE website (attached as Ex. 7 to the Compl.) and its URL, Pro-Concepts has shown the requisite similarity of the marks.

### (3) Similarity of Good or Services

To satisfy this prong, the goods or services offered by the parties "need not be identical or in direct competition with each other." George & Co., 575 F.3d at 397. It is sufficient if "the products or services provided by the two companies serve the same purpose." Pizzeria Uno Corp., 747 F.2d at 1535. Pro-Concepts argues that both parties are using the Risk Radar mark in the area of software services, but Pro-Concepts acknowledges that Resh's website does not contain any information regarding project management services or related software.[5] Instead, Pro-

---

[5] Although the heading of Resh's website is "Risk Radar Enterprise Software."

Concepts asks the Court to infer similarity of services based on the following facts: (1) software design is Resh's profession, (2) Resh is an expert in that field; (3) Resh previously operated his own software company, (4) Resh is allegedly in possession of Pro-Concepts' proprietary software, and (5) the contact information provided on Resh's website is connected to Whisper Technology, Inc., a technology company that lists Resh as its sole officer and director. Resh contends that he has purged all copies of Pro-Concepts' software and that he is not "transacting any commerce with regards to Risk Radar, Risk Management, or any services which conflict with [Pro-Concepts]." ECF No. 12. Resh also testified at the preliminary injunction hearing that he was not using the website or the mark "Risk Radar" for any commercial purposes and that Whisper Technology, Inc. is a former company. Tr. 50-51, 54, 60.

Pro-Concepts bears the burden to clearly show that it is likely to succeed on its trademark infringement claims. Evidence of Resh's profession, expertise, and prior company do not establish that he is offering a good or service, and the allegation that he is in possession of a copy of Risk Radar Enterprise Software does not suffice to show that Resh is offering software and technology services or products under the Risk Radar name, especially given Resh's sworn testimony that he is not using the mark commercially in any way. Thus, Pro-

Concepts has not met its burden to show that the parties are offering similar services.

### (4) Similarity of Facilities

Pro-Concepts does not argue this factor and there is limited evidence before the Court concerning the facilities used by either party.  To the extent that there is evidence before the Court regarding this factor, it appears the Pro-Concepts has its principle offices in Virginia Beach, Virginia and that Resh is an individual residing in Virginia Beach, Virginia and is currently seeking employment and thus does not have a separate professional office.  Pro-Concepts does represent that both parties maintain a web presence that refers to Risk Radar Enterprise, however web advertising is addressed under the fifth factor, similarity in advertising.  Additionally, if the product is for the most part sold via internet or phone transaction, similarity of facilities would be irrelevant.  Thus, there does not appear to be any similarity of physical facilities and the extent to which non-physical facilities may resemble each other is adequately addressed by the fifth factor.

### (5) Similarity in Advertising

In considering similarity of advertising, the Court should look to both the advertising media used and the areas in which the parties advertise.  <u>Pizzeria Uno</u>, 747 F.2d at 1535.  Pro-Concepts argues that both parties are advertising on the

23

internet and attaches copies of their respective websites as Exhibit 4 to their brief.  Resh's website utilizes "Risk Radar" in its domain name and website heading, while Pro-Concepts lists "RiskRadar" as a product on its website.  Both sites refer to "Risk Radar Enterprise" software.  Thus, it appears that both parties are using the same advertising media (the Internet) and, based on the widespread availability of the internet, that a large number of consumers will encounter advertisements for both.  See id.  (finding geographic overlap unlikely where the plaintiff advertised nationally and the defendant advertised locally in a locality not expressly targeted in the plaintiff's national campaign).  Therefore, Pro-Concepts has shown sufficient similarity in advertising.

### (6) Defendant's Intent

Evidence of the defendant's intent is not required to prevail on a trademark infringement claim.  Sweetwater Brewing Co., 266 F. Supp. 2d at 463.  However, evidence of the defendant's intent can, in some cases, be a "major" factor for the Court's consideration.  George & Co., 575 F.3d at 397. Specifically, "[i]f there is intent to confuse the buying public, this is strong evidence establishing likelihood of confusion, since one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc., to resemble the other's so as to deliberately induce

24

confusion." Id. (quoting Pizzeria Uno, 747 F.2d at 1535). However, "[t]he intent of a junior user is relevant only if the junior user intended to capitalize on the good will associated with the senior user's mark." CareFirst of Maryland, Inc. 434 F.3d at 273. Pro-Concepts argues that Resh had the requisite intent because Resh knew of the mark through his employment at Pro-Concepts, redirected the website at issue away from Pro-Concepts' website after his termination, and has since received two demands from Pro-Concepts that he cease using the mark. Resh has testified that he originally obtained the website for the purpose of protecting the Risk Radar product Tr. 51, 53. Furthermore, Mr. O'Rourke, President of Pro-Concepts, testified that this was Resh's intent in registering the RRE website. Tr. 17, 19-20. Resh also asserts that he offered to sell the website to Pro-Concepts several times and that such offers were rejected.

This does not appear to be a case in which the defendant was unaware of the mark when he began using it. See Sweetwater Brewing Co., 266 F. Supp. 2d at 463. However, neither is this a case where intent to confuse or intent to profit from another's reputation is shown. Resh is not using the RRE website or the "Risk Radar" mark for commercial purposes. Tr. 50-51, 54. Resh is not trying to establish recognition, association, or good will of his own product through use of the mark. See, CareFirst

25

of Maryland, Inc. 434 F.3d at 273; Sweetwater Brewing Co., 266
F. Supp. 2d at 463.    Therefore Pro-Concepts has failed to
demonstrate a likelihood of success on the merits under this
factor.

## (7) Actual Confusion

The seventh factor is the "most important factor." George
& Co., 575 F.3d at 398. "Actual confusion can be demonstrated by
both anecdotal and survey evidence." Id. (citing Tools USA &
Equip. Co. v. champ Frame Straightening Equip., Inc., 87 F.3d
654, 661 (4th Cir. 1996)).    Confusion can be as to the source,
affiliation, connection, or sponsorship.    Rosetta Stone, 676
F.3d at 157.   In weighing the evidence of actual confusion:

> [E]vidence of the number of instances of actual
> confusion must be placed against the background of the
> number of opportunities for confusion before one can
> make an informed decision as to the weight to be given
> the evidence.    If there is a very large volume of
> contacts or transactions which could give rise to
> confusion and there is only a handful of instances of
> actual confusion, the evidence of actual confusion may
> receive relatively little weight.

George & Co., 575 F.3d at 398. (citing McCarthy § 23:14).    In
such cases, "[e]vidence of only a small number of instances of
actual confusion may be dismissed as de minimis." Id. (citing
Petro Stopping, 130 F.3d at 95).

Pro-Concepts represents that it has documented over sixty
cases of actual confusion by customers or potential customers.

26

ECF No. 4. However, Pro-Concepts' brief references Exhibits 9 and 10 to support this claim and there are only four exhibits attached to Pro-Concepts' brief. Pro-Concepts acknowledged at the hearing that this was an argument from a prior brief in another case but failed to address whether actual confusion is present in this case. Given that Pro-Concepts has only 120 clients, it appears to be a fairly small company, in which case a small number of instances of actual confusion would likely not be de minimis. See George & Co., 575 F.3d at 399 (finding four instances of actual confusion de minimis where the plaintiff sold 500,000 games per year). However, as Pro-Concepts has failed to provide the Court with any evidence in support of this factor, it has failed to establish that defendant has caused actual confusion.

#### (8) Quality of Defendant's Product

This factor is relevant in "situations involving the production of cheap copies or knockoffs of a competitor's trademark-protected goods." George & Co., 575 F.3d at 399 (quoting Sara Lee Corp., 81 F.3d at 467). Pro-Concepts concedes that this factor is not relevant and there is no evidence that Resh has priced any goods or services below those offered by Pro-Concepts. Furthermore, Resh has testified that he is not using the RRE website or the trademark at issue for any

27

commercial purpose. Tr. 50-51, 54. Therefore, the Court finds this factor irrelevant in the instant case.

### (9) Sophistication of the Consuming Public

The ninth factor is only relevant "when the relevant market is not the public at-large." George & Co., 575 F.3d at 400. "If the typical consumer in the relevant market is sophisticated in the use of—or possesses an expertise regarding—a particular product, such sophistication or expertise may be pertinent in determining the likelihood of confusion." Sara Lee Corp., 81 F.3d at 467. Where the consuming market is extremely sophisticated, this factor may even trump all other factors in considering the likelihood of confusion as a sophisticated consumer is unlikely to confuse one company for another based on the name alone. Perini, 915 F.2d at 127-128.

Pro-Concepts argues that this factor is not relevant to the Court's analysis. However, because Pro-Concepts offers software for sale and has a limited number of clients, the Court does not rule out this factor's relevancy based on Pro-Concepts' assertion alone. Mr. O'Rourke testified at the hearing that Pro-Concepts acquires two or three clients a month and that advertising for their Risk Radar products has been done through the Risk Management Buyer's Guide. Tr. 25. Pro-Concepts' limited client pool, along with their advertising through the Risk Management Buyer's Guide, which describes itself as a

28

database dedicated to risk management professionals, indicates that the "Risk Radar" software is targeted at a fairly sophisticated market of consumers. The sophistication of its consumers is further supported by the cost of the software, which Mr. O'Rourke testified to range from at least $7,800, for an initial product purchase, up to $32,000. Tr. 25. It is unlikely that a consumer paying thousands of dollars for a software program would suffer confusion from a similarity in names, especially where only one is offering a product for sale. The sophistication of Risk Radar software's typical consumer thus likely trumps the two factors which Pro-Concepts has shown to support a likelihood of confusion.

### (iii) Summary

Pro-Concepts has established that it has a valid and protectable mark in "Risk Radar." However, it has failed to demonstrate that Resh's RRE website creates a likelihood of confusion among the consuming public. Specifically, Pro-Concepts has a weak mark because there is no evidence as to the mark's commercial strength. Defendant lacked the intent to copy or adopt Pro-Concepts' Risk Radar mark in an effort to pass his own goods or services off under that mark as Resh is not using the mark in a commercial manner and is not offering a good or service. Although Resh is employing a similar mark via functionally and geographically similar methods of advertising,

29

these are the only factors which support Pro-Concepts' assertion
of a likelihood of confusion and they are likely trumped by the
sophistication of the consuming public. Based on the evidence
presently before the Court, it is likely that the typical
consumer of the Risk Radar software is "sophisticated in the use
of—or possesses an expertise regarding—"the particular type of
software at issue. Sara Lee Corp., 81 F.3d at 467.
Additionally, Pro-Concepts has failed to show any cases of
actual confusion among customers and potential customers.
Pro-Concepts has thus failed to establish that it is likely to
succeed on the merits of its trademark infringement claim.

## 2. Count III—Cybersquatting

The Court now turns to consideration of the likelihood of
success on Pro-Concepts' cybersquatting claim. In its brief,
Pro-Concepts states that it seeks a preliminary injunction to
prevent Resh from maintaining a website using the Risk Radar
mark as part of the domain name by either "redirecting the site
to send any visitors to Plaintiff's website or by shutting down
the site." ECF No. 4 at 7. Pro-Concepts' motion, however, asks
the Court to "[i]mmediately transfer ownership and control in
the website www.riskradarenterprise.com to Pro-Concepts." ECF
No. 3. Thus, Pro-Concepts requests mandatory injunctive relief
in its motion (transfer of ownership) but argues for different
mandatory injunctive relief in its brief (redirection back to

Pro-Concepts' website or shutting down the website).  The Court asked for clarification as to which form of relief was sought at the hearing and Pro-Concepts stated that the mandatory relief, either through a transfer of the ownership of the RRE website or establishing a redirect to the Pro-Concepts' website, was indeed sought, but that it would settle for the prohibitive relief of preventing the website from appearing in searches and removing it temporarily from the public domain.  Tr. 70.  As such, while the standard of review for prohibitive injunctions is the minimum standard which applies, the more exacting standard of review must be satisfied before the mandatory relief will be granted.

Cybersquatting is "the practice of registering 'well-known brand names as Internet domain names' in order to force the rightful owners of the mark 'to pay for the right to engage in electronic commerce under their own brand name.'" Virtual Works, Inc. v. Volkswagen of Am. Inc. 238 F.3d 264, 267 (4th Cir. 2001).  Counterfeit activities and the misuse of the domain name to divert customers from the mark owner's site may also qualify as cybersquatting. Lamparello v. Falwell, 420 F.d 309, 318 (4th Cir. 2005). To prevail on a cybersquatting claim under the Anticybersquatting Consumer Protection Act ("ACPA"), a plaintiff must demonstrate that (1) the defendant had a "bad faith intent to profit" from plaintiff's mark;  and  (2)  the  defendant

registered, trafficked in, or used a domain name that "is identical or confusingly similar to, or dilutive of" plaintiff's distinctive mark. Lamparello v. Falwell, 420 F.3d 309 (4th Cir. 2005); see also 15 U.S.C. § 1125(d)(1)(A). Pro-Concepts argues that Resh's website domain name and verbiage "use the exact, identical terms" as Pro-Concepts' mark "Risk Radar." ECF No. 4 at 7. As Resh's RRE website uses the term "Risk Radar Enterprise," which includes the phrase "Risk Radar," the second prong of the ACPA's test is met in this case.

In determining whether Resh acted with a bad faith intent to profit from Pro-Concepts' mark, the Court should consider nine statutory factors. See 15 U.S.C. § 1125(d)(1)(B). Specifically, with respect to the person allegedly cybersquatting on another's mark, "a court may consider factors such as, but not limited to—"

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
> (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
> (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
> (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
> (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by

creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
(VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
(VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
(VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
(IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section.

15 U.S.C. § 1125(d)(1)(B)(i). The Court may not find the requisite bad faith if "the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). Additionally, because the statutory factors are permissive, the Court is not required to consider them all. Lamparello, 420 F.3d at 319. The factors serve merely as a guide, and the Court should still carefully consider whether the conduct at issue was motivated by a bad faith intent to profit. Id. at 319-20.

33

Regarding the first factor, Resh acknowledged at the hearing that he has no trademark or intellectual property rights in the domain name beyond his ownership of the domain name itself. Tr. 58. Nor does the domain name consist of a legal name or name readily used to identify Resh. Therefore, the first two statutory factors appear to weigh in favor of a finding of bad faith.

Resh owned the domain name before Pro-Concepts acquired its interest in the mark and, further, the facts before the Court show that Resh did not acquire the domain on behalf of Pro-Concepts' predecessor in interest and that, when Pro-Concepts acquired exclusive interest in the Risk Radar mark, Resh redirected the website at issue to Pro-Concepts' website. Thus, although there is prior use, all such use appears to have been for the benefit of the mark-holder and not any bona fide offering of goods or services by Resh and as such factor three weighs against a finding of bad faith.

Resh denies that he acquired the RRE website on behalf of Pro-Concepts' predecessor in interest, ASC, and testified at the hearing that he acquired the RRE website to protect the Risk Radar product which he was helping develop. Tr. 51. Resh also stated that after he acquired the RRE website, ASC had no interest in the website and prohibited Resh from setting up a redirect or putting company information on the RRE website under

ASC's policies which prohibited setting up a website outside the main company website. Tr. 53. Thus, while there are no facts suggesting that Resh has ever made a bona fide noncommercial or fair use of the Risk Radar mark using the site accessible under the domain name at issue, factor four only weakly weighs in favor of a finding of bad faith.

The fifth factor also does not support a finding of bad faith in this case. The domain name at issue was not purchased on behalf of Pro-Concepts' predecessor in interest. After beginning employment at Pro-Concepts, Resh voluntarily redirected the domain name to Pro-Concepts' site and, after his termination, Resh disabled the redirect. The prior use of the domain name and the timing of Resh's redirection of the domain name do not suggest with certainty whether Resh did or did not intend to divert customers from Pro-Concepts' website to his own. However, while the RRE website does use the phrase "Risk Radar" in its domain name and as the header, it does not list any information related to Pro-Concepts nor indicate any product or services beyond the name "Risk Radar Enterprise," and Resh is not using the RRE website in a commercial manner. Furthermore, the fifth factor bears a significant similarity to the likelihood of confusion factor addressed above in the trademark infringement claim analysis, on which Pro-Concepts failed to show a likelihood of success on the merits.

35

With respect to the sixth factor, the Court notes that while Resh's representations that he offered several times to sell the RRE website to both ASC and Pro-Concepts would generally weigh in favor of a finding of bad faith, in this case the finding is more ambiguous as there is evidence that Resh did so, not for financial gain, but for reimbursement.    The evidence, as presented to the Court, indicates that Resh attempted to transfer the site to the markholder for an amount equal to the cost of acquiring and maintaining the domain.    In cases where the domain name owner tries to sell the domain name to the mark owner, the courts have generally found the domain name owner had a bad faith intent to profit, yet in most of those cases the domain name owner had no legitimate use for the domain name to begin with and they asked a price not based on compensation but on how much they felt they could get the mark owner to pay.    See, Domain Names Clearing Co v. F.C.F. Inc., 16 F. App'x 108, 111 (4th Cir. 2001) (where the domain name owner did not use the domain or have plans to use the domain name, but it tried to sell it to the mark owner based on the price of a high exposure advertisement); People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 369 (4th Cir. 2001)(where defendant had no right to the PETA name or mark and encouraged the mark owner to "'settle' and 'make him an offer'"); Virtual Works, Inc., 238 F.3d at 267 (where the domain name owner

36

threatened to sell the domain to the highest bidder unless the mark owner bought the rights to the domain name).  Furthermore, Mr. O'Rourke denied any discussions with Resh over a potential purchase of the RRE website.  Tr. 24.  Mr. O'Rourke stated that only initial discussions on the potential "transfer" of the RRE website took place.  Tr. 22.  Thus, based on the evidence before the Court at this time, the sixth factor weighs against a finding of bad faith intent to profit.

Regarding the seventh factor, Pro-Concepts alleges Resh attempted to hide his continued ownership by using "the suspected alias, Timothy Alston as the domain registrant and by using an address on the registration for a home owned by his father."  ECF No. 4 at 9.  Pro-Concepts has provided a copy of the renewed domain registration, which shows that these facts continue to be the case.  ECF No. 29, Ex. A.  However, at the hearing Resh clarified that the name used to register the RRE website, Timothy Alston, was actually a name he had previously used and that his name changed in high school.  Tr. 59.  His stated reason for using this prior name to register the RRE website was that, at the time, Yahoo! did not have the security in place to protect registrant's information and Resh wanted to avoid being spammed.  Tr. 59.    Nevertheless, despite Resh's lack of a pattern or history of such prior conduct, he did provide "material and misleading false contact information when

37

applying for the registration of the domain name" and has "fail[ed] to maintain accurate contact information." 15 U.S.C. § 1125(d)(1)(B)(i). Thus, the seventh factor tends to weigh in favor of a finding of bad faith.

The eighth factor, however, does not support a finding of bad faith. Specifically, there is no evidence that Resh has registered multiple domain names. Only one domain name is at issue in this case. See Lamparello, 420 F.3d at 320-21 (finding no bad faith where the defendant registered only one domain as a "gripe" site).

It is unclear what weight, if any, should be given to the ninth factor, which requires the Court to consider the extent to which the mark incorporated in the domain name is distinctive or famous under the ACPA. A mark is "distinctive and famous" if it is "widely recognized by the general consuming public of the United States as a designation of [sic] source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Pro-Concepts has not argued that its Risk Radar mark is "distinctive and famous" under the ACPA. Accordingly, there is nothing currently before the Court that would enable it to determine how the ninth factor applies, if at all, to the bad faith analysis in this case. However, the balance of the preceding factors and a careful consideration of the facts in this case do not support a finding of bad faith in and of themselves and it is unlikely

38

that evidence as to the ninth factor would be sufficient to require a finding of bad faith.

Specifically, the evidence before the Court shows an absence of any bad faith intent to profit. Resh is not making any commercial use of the mark and he obtained the RRE website for the benefit of the product associated with the mark and, thus, for the overall benefit of the original markholder as well. Furthermore, Resh's testimony shows some basis for a reasonable belief that he could use the RRE website based on his pre-existing ownership and Mr. O'Rourke's refusal to reimburse at ASC and failure to follow up regarding the transfer of the domain after acquiring the Risk Radar mark for Pro-Concepts. There is no likelihood of confusion, no registration of multiple domain names, and no attempt to sell the domain for profit. See, Lamparello at 321.

While there are a few factors that weigh in favor of Pro-Concepts, these factors alone are not sufficient to support a finding of bad faith intent to profit. As to factor one, Resh has no trademark or intellectual property rights in the domain name beyond his ownership of the domain name itself. Nor does the domain name consist of a legal name or name readily used to identify Resh, factor two. Factor four weakly weighs in favor of a finding of bad faith due the Resh's lack of prior bona fide noncommercial or fair use of the RRE website. Additionally,

39

Resh's provision of false contact information when registering the domain name also supports a finding of bad faith in this case, factor seven.   However, these are the only factors weighing in favor of a finding of bad faith and the inference of bad faith from these factors should not be relied upon based on the total absence of bad faith in the acquisition and maintenance of the RRE website as established by Resh's testimony at the hearing.

Pro-Concepts has failed to make a clear showing that it will succeed on the merits of its claim of cybersquatting.   As Pro-Concepts has failed to show a likelihood of success on the merits that would support a prohibitive preliminary injunction, it has necessarily also failed to show likelihood of success on the merits that would satisfy the more exacting standard that applies to requests for mandatory injunctive relief.

### 3. Count VI—Breach of Contract

The Court must also consider Pro-Concepts' likelihood of success on Count VI.   Pro-Concepts claims that Resh's breach of his employment agreement supports a preliminary injunction requiring him to return Pro-Concepts' Risk Radar software immediately.   Based on the fact that such injunction mandates action (i.e., the return of the software), the Court will apply the more exacting standard to Count VI.

To state a claim for breach of contract, Pro-Concepts must show: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." Filak v. George, 594 S.E.2d 610, 614 (Va. 2004).

### (i) Legally Enforceable Obligation

Pro-Concepts argues that its employment agreement with Resh created in Resh a legally enforceable obligation to Pro-Concepts. Specifically, Pro-Concepts claims that the parties entered into a valid, binding, and unambiguous employment agreement in which Resh affirmed that all work performed by him for Pro-Concepts belongs solely to Pro-Concepts or its clients and that Resh had no ownership or licensing rights to that work. ECF No. 4 at 27. Under Virginia law an employment agreement may constitute a legally enforceable obligation, however, when such an agreement contains restrictive covenants, it is the province of the Court to determine whether the restrictive covenant is enforceable. Simmons v. Miller, 544 S.E.2d 666, 678 (Va. 2001). Resh's contract contains restrictive covenants (including a confidentiality clause and a non-compete clause), however, these covenants do not appear to be at issue in this case. Rather, Pro-Concepts seeks to enforce its work products clause, ¶ 10 and termination clause, ¶ 13. Mot. for Prelim. Inj. Memo, Ex. 2 at

41

4-5, ECF No. 4.  The work products clause states that "all work performed for Pro-Concepts belongs to Pro-Concepts or its Clients."  Id. at 4, ¶ 10.  The allegedly breached portion of the termination clause states that:

> Upon termination of employment, [Resh] agree[s] to return to Pro-Concepts all Company or Client property in my possession, including but not limited to any computers, . . . and other tangible manifestations of Confidential Information (and all copies and reproductions thereof)

Id. at 5, ¶ 13(b).  Resh suggested that he was released from this contract upon termination, however the termination clause, ¶ 13(c), specifically states that termination does not release Resh from the obligations set forth in the agreement.  Id. at 5. Thus, as the employment agreement did create a legally enforceable obligation, we next turn to whether that obligation was breached.

### (ii) Breach of Obligation

Pro-Concepts argues that Resh breached his employment agreement by retaining the Risk Radar Enterprise software after his termination.  Specifically, retention of the software appears to violate ¶ 13(b), which requires Resh to return all company or client property in his possession upon his termination.  Because ¶ 10 of the employment agreement states that any work performed for Pro-Concepts belongs solely to Pro-Concepts or its clients and that Resh has no ownership or

42

licensing rights in such work product, Resh's work on the Risk Radar software after beginning employment with Pro-Concepts (including the updates retained on his personal laptop) appears to constitute work product that Resh was required to return upon his termination.  Resh testified at the hearing that he has purged all Risk Radar software from his personal computer except the files which were taken from ASC at the time of the transfer of Risk Radar between ASC and Pro-Concepts.  Tr. 60, 65-66. Thus, while Resh may have been in violation of the employment agreement when he left Pro-Concepts in possession of the software code, as Resh has since that time purged all copies of the work performed for Pro-Concepts, as instructed by Pro-Concepts' Cease and Desist letter of August 10, 2012, the mandatory relief requested is no longer possible with regards to those copies of the software and the question is moot for the purposes of a preliminary injunction.  Compl., Ex. 5 at 2, ECF No. 1.

However, Resh testified that he still had a copy of the software version and files which were copied from the ASC servers.  Thus, whether Resh is in breach of the employment agreement hinges on Pro-Concepts' property rights in the ASC version of the Risk Radar software.  This is a factual dispute on which Pro-Concepts has offered testimony and the affidavit of Mr. O'Rourke, which states that "Risk Radar Enterprise and Risk

Radar 2012 are the property of Pro-Concepts, and Pro-Concepts owns and controls all proprietary rights in the software." ECF No. 4, Ex. 1 ¶ 5. Pro-Concepts bears the burden to show a violation of the obligation and they have done so, inasmuch as they have shown that Resh was and is still in possession of software in which Pro-Concepts has proprietary rights.

### (iii) Damages

To show that it is likely to succeed on the merits of a breach of contract claim, Pro-Concepts must establish that it suffered injury or damage because of Resh's breach of obligation. Filak, 594 S.E.2d at 614. "Proof of damages is an essential element" and Pro-Concepts "bears 'the burden of proving with reasonable certainty the amount of damages and the cause from which they resulted; speculation and conjecture cannot form the basis of recovery.'" Manchester Oaks Homeowners Ass'n, Inc. v. Batt, 732 S.E.2d 690, 699 (Va. 2012) (quoting Shepherd v. Davis, 574 S.E.2d 514, 524 (Va. 2003)). To satisfy this burden, Pro-Concepts must "furnish evidence of sufficient facts and circumstances to permit the fact-finder to make at least an intelligent and probable estimate of the damages sustained." Id. (quoting Dillingham v. Hall, 365 S.E.2d 738, 739 (Va. 1988)). "Proof with mathematical precision is not required, but there must be at least sufficient evidence to

44

permit an intelligent and probable estimate of the amount of damage." Id.

Pro-Concepts has argued that, as a result of Resh's retention of all software updates performed during the course of his employment, Pro-Concepts has been unable to complete its semi-annual client software update. "As a result, [Pro-Concepts] has been forced to spend thousands of dollars in an attempt to recreate the changes programmed by [Resh]. Additionally, at least one client has announced its intention [to] no longer use [Pro-Concepts'] services once its contract expires." ECF No. 4 at 27-28. The only evidence offered to support this argument is a sworn affidavit from Pro-Concepts' president, Shawn T. O'Rourke. ECF No. 4 Ex. 1, ¶ 22 (noting that, after Resh's termination, Pro-Concepts discovered that the versions of Risk Radar Enterprise and Risk Radar 2012 remaining with the company were nonfunctional and lacked months of Resh's work, requiring Pro-Concepts to "spend thousands of dollars" to hire a new programmer to replicate Resh's work). At the hearing, Mr. O'Rourke testified that it had taken a new developer from August 1st to the middle of September to "make a build of the software" and that new issues with old versions of the software, for which they don't have the original code, have cropped up. Tr. 27-28. However, Pro-Concepts failed to provide evidence as to the actual cost or as to the developer's salary.

45

Although Pro-Concepts' argument and O'Rourke's affidavit provide some basis upon which the Court could estimate damages, the evidence currently before the Court is insufficient to permit an "intelligent and probable estimate" of the damages suffered to date. Further, Pro-Concepts' arguments indicate that the true damage is not from Resh's retention of the software after his termination, but Pro-Concepts' lack of copies of the software build code and updates to it. Resh testified at the hearing that he saved copies of the source code, runtimes, and build codes and that those files were still there when he left. Tr. 56. Mr. O'Rourke confirmed that he remembered a brief walk-through of the file storage with Resh. Tr. 36. To show a likelihood of success on the merits of their breach of contract claim, Pro-Concepts must show "injury or damage to the plaintiff caused by the breach of obligation." Filak, 594 S.E.2d at 614. (emphasis added) As the files must have been present for the file storage demonstration to have taken place and Resh has testified that he did not remove them, Pro-Concepts has failed to show at this stage of the litigation that its lack of software build codes and source codes is due to Resh's breach of the obligation.

### (iv) Summary

While the Court finds that Resh's employment agreement with Pro-Concepts created a legally enforceable obligation, Pro-

Concepts did not adequately flesh out the amount of damages they suffered and has failed to show that the damages were due to Resh's actions, especially as Resh purged his copy of the updates' source code at Pro-Concepts' request. Pro-Concepts has failed to clearly show that it is likely to succeed on the merits of Count VI under the more exacting inquiry applicable to requests for mandatory injunctive relief.

#### 4. Count VII—Conversion

Pro-Concepts must also show a likelihood of success on Count VII in order to succeed on its injunction motion. Pro-Concepts claims that Resh's conversion of Pro-Concepts' proprietary software supports a preliminary injunction requiring him to immediately return Pro-Concepts' Risk Radar software. As with Pro-Concepts' breach of contract argument, it would appear that, because the relief sought mandates action (i.e., the return of the software), the Court should apply the more exacting standard to Count VII.

Under Virginia law, a person is liable for conversion for "the wrongful exercise or assumption of authority over another's goods, depriving the owner of their possession, or any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights." Simmons v. Miller, 544 S.E.2d at 679. Thus, "to assert a claim for conversion, [Pro-Concepts] must prove by a preponderance of the evidence (1) the

ownership or right to possession of the property at the time of conversion and (2) the wrongful exercise of dominion or control by [Resh] over [Pro-Concepts'] property, thus depriving [Pro-Concepts] of possession." Airlines Reporting Corp. v. Pishvaian, 155 F. Supp. 2d 659, 664 (E.D. Va. 2001).

Pro-Concepts argues that, since its inception, it has possessed sole and complete rights to the Risk Radar Software. Although Pro-Concepts has provided the Court with the trademark registration and assignment, Pro-Concepts has submitted little physical evidence concerning the Risk Radar software. As above, the only evidence currently before the Court is Mr. O'Rourke's testimony at the hearing and his sworn affidavit, which states that "Risk Radar Enterprise and Risk Radar 2012 are the property of Pro-Concepts, and Pro-Concepts owns and controls all proprietary rights in the software." ECF No. 4, Ex. 1 ¶ 5. The affidavit goes on to state that Resh was hired on March 30, 2009 to work on the Risk Radar Enterprise software. Id. ¶ 10. Based on these representations, it would appear that Pro-Concepts had a property right in the Risk Radar Enterprise software before Resh's employment began, a right that has allegedly continued to the present time.

The Court should apply the same analysis to the second prong of the conversion inquiry that it applied to the breach analysis in Count VI. Specifically, the employment agreement

48

states that Resh has no ownership or licensing rights in any work performed for Pro-Concepts (¶ 10) and requires him to return all such work upon his termination (¶13(b)). In retaining copies of Risk Radar Enterprise software on his personal computer after his termination, Resh wrongfully exercised dominion or control over Pro-Concepts' property (the software). Resh's conduct, however, did not deprive Pro-Concepts of control over its property because Resh testified that he left Pro-Concepts with working copies of their proprietary software, including the build codes, runtimes, etc. Furthermore, as the Court finds from Resh's sworn testimony that Resh no longer has possession of such software, beyond the original code from ASC,[6] it need not consider the mandatory injunctive relief under Counts VI and VII with regard to any software beyond the code still in his possession. Therefore, while the Court is satisfied as to Pro-Concepts' ownership or possessory rights in the software, Pro-Concepts has failed to show that Resh's wrongful exercise of dominion deprived Pro-Concepts of possession. Accordingly, Pro-Concepts has not clearly shown that they are likely to succeed on the merits of

---

[6] Resh testified that he no longer has possession of any other version of the Risk Radar software as all other versions in his possession were purged from his computer as instructed by Pro-Concepts' Cease and Desist letter of August 10, 2012. Tr. 65-66. However, Resh testified that he still had a copy of the software version and files which were copied from the ASC servers. Tr. 60, 65-66.

49

Count VII under the more exacting inquiry applicable to requests
for mandatory injunctive relief.

## 5. Conclusion

Based on the evidence and argument currently before the
Court, Pro-Concepts has failed to clearly show that it is likely
to succeed on the merits as to Counts I, III, VI, and VII.
Therefore, the Court will not grant the prohibitive and
mandatory injunctive relief sought. Since Pro-Concepts has
failed to meet this standard, even if it satisfied the remaining
factors, the Court cannot grant the injunctive relief requested.
However, in the interest of clarity, the Court will briefly
address these factors as well.

## B. Likelihood of Irreparable Harm (Absent Preliminary

## Injunction Relief)

In addition to showing likelihood of success on the merits,
a showing of the likelihood of irreparable injury absent
injunctive relief is also required. Winter, 555 U.S. at 22. A
mere possibility of irreparable harm is not enough. Id. The
irreparable harm must be "actual and imminent" to satisfy this
prong of the inquiry. Direx Israel, Ltd. v. Breakthrough Med.
Corp., 952 F.2d 802, 812 (4th Cir. 1991). Generally, a
plaintiff can show that "irreparable injury is suffered when
monetary damages are difficult to ascertain or are inadequate."
Multi-Channel TV Cable Co. v. Charlottesville Quality Cable

Operating Co., 22 F.3d 546, 551 (4th Cir. 1994) (quoting Danielson v. Local 275, 479 F.2d 1033, 1037 (2d Cir. 1973)). Additionally, the Fourth Circuit has stated (albeit before Winters) that "when the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied."[7] Id. Courts considering this prong post-Winter often require specific evidence concerning the actual or potential loss of customers or goodwill before finding irreparable injury. See, e.g., Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship, 2009 WL 111603, at *2-5 (E.D. Va. Jan. 14, 2009). This approach is consistent with the requirement that a plaintiff show that irreparable harm is likely and not merely possible. Winter, 555 U.S. at 22. This is not to say that Pro-Concepts is required to establish specific losses, but rather that Pro-Concepts must present sufficient evidence for the Court to find that it is likely that such losses have occurred or will occur absent preliminary injunctive relief.

Pro-Concepts argues that this Court may presume irreparable injury because Resh is seeking to confuse and mislead Pro-

---

[7] The Court notes that this case predates Winters and therefore, it is likely that the Court must find not only a possibility of lost customers or good will, but that such losses are likely given the conduct alleged in this case.

Concepts' customers and, under Fourth Circuit law, a presumption of irreparable injury applies in trademark infringement actions where the Court finds a likelihood of confusion. ECF No. 4 at 17 (citing Scotts Co. v. United Indus. Corp., 315 F.3d 264, 273 (4th Cir. 2002)). As a threshold matter, it is unlikely that the presumption alleged in the context of trademark infringement remains viable after the Supreme Court's decision in Winter. Specifically, the Supreme Court held that the plaintiff bears the burden to clearly show entitlement to preliminary injunctive relief and that, to satisfy this burden, the plaintiff must show a likelihood of irreparable harm, not a possibility. Winter, 555 U.S. at 22. Thus, the Court should not rely on a presumption of irreparable injury based on the likelihood that Resh's actions—whether intentional or not—are likely to confuse or mislead Pro-Concepts' customers. Instead, the Court should consider the evidence presented as to the effect, on Pro-Concepts' ability to obtain and retain customers and on Pro-Concepts' good will, of both Resh's maintenance of the website, www.riskradarenterprise.com, and his retention, then purging at Pro-Concepts' request, of the copies of Risk Radar software. Having considered these facts in the context of the above determinations regarding likelihood of success on the merits of Pro-Concepts' various claims, the harms alleged do not meet the requirement of being "actual and imminent" and irreparable

absent the requested preliminary injunctive relief. Furthermore, as Resh has voluntarily taken the RRE website down pending the outcome of this case (at the request of the Court), there is no opportunity for confusion among potential customers.[8] Additionally, as Resh is no longer in possession of any software except the version which was copied from ASC, Pro-Concepts has not shown that the relief requested would remedy the harm alleged with regard to the software.

## C. Balance of Equities

The third prong of the preliminary injunction analysis requires Pro-Concepts to establish that the balance of equities tips in its favor. Winter, 555 U.S. at 20. In considering the equities between the parties, the Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the relief requested." Id. at 24 (quoting Amoco Prod. Co. v. Village of Gambell, AK, 480 U.S. 531, 542 (1987)).

Pro-Concepts has alleged several injuries, including damage to its goodwill and the reputation of its Risk Radar mark based on Resh's maintenance of his own website using the mark. Additionally, Pro-Concepts has alleged that Resh's retention of

---

[8] While the Court acknowledges Mr. Byers' submitted declaration, ECF No. 29, regarding Resh's renewal of his registration of the RRE website, the fact remains that Resh has voluntarily taken down the RRE website and the RRE website remains inaccessible.

the only working copy of Risk Radar Enterprise software has left
Pro-Concepts unable to comply with its current contractual
software update obligations and has required Pro-Concepts to
expend thousands of dollars in an attempt to recreate Resh's
work. However, testimony from Resh indicates that he does not
have copies of any Risk Radar software beyond the ASC version
and that when he was terminated, he left working copies at Pro-
Concepts.

On the other hand, there is no evidence before the Court
concerning any injury Resh might suffer if the Court grants the
relief sought. Resh apparently has no rights in the Risk Radar
mark, nor in the Risk Radar software (per his employment
agreement). Resh does not assert any injury in his motion other
than Pro-Concepts' allegedly wrongful retention of certain
property (not the Risk Radar software) after Resh's termination.
Resh's claim is thus apparently unrelated to the relief that
Pro-Concepts seeks. Therefore, on the facts currently before
the Court, the relief sought would require Resh to cease using
Pro-Concepts' mark and to return all copies of Pro-Concepts'
proprietary software still in his possession. These do not
appear to be injuries that the Court should countenance in its
balance of the equities. Therefore, this prong at least weighs
in Pro-Concepts' favor.

## D. Public Interest

The Supreme Court has emphasized the public interest requirement, stating that, "[i]n exercising their sound discretion, courts of equity should pay particular regard for the public consequences of employing the extraordinary remedy of injunction." Winter, 555 at 24. As Pro-Concepts correctly notes, the purpose of trademark is to protect the public from confusion "as to the identity of the enterprise from which goods and services are purchased." AMP v. Foy, 540 F.2d 1181, 1185 (4th Cir. 1976). A preliminary injunction preventing further violation of the Lanham Act serves "the public interest by preventing future customers from being misled." Lone Star Steakhouse, 43 F.3d at 939. The public interest is also served when an injunction prevents trademarks from being used deceptively. Bowe Bell & Howell Co. v. Harris, 145 Fed. App'x 401, 404 (4th Cir. 2005) (unpublished). Additionally, the public has an interest in the enforcement of valid contracts. Western Indus.-North, 2012 WL 966028, at *16. However, based on the facts currently before the Court, the public interest does not weigh in Pro-Concepts' favor as Resh has willingly taken the website down for the duration of this case and there is no evidence before the Court of actual or potential confusion. While the public interest in the enforcement of valid contracts does weigh in Pro-Concepts' favor, this is somewhat moot as the

relief they request is, for the most part, unavailable due to Resh's compliance with their own cease-and-desist letter. Particularly in view of the countervailing explanation for Resh's conduct with regard to the RRE website, it appears that the public interest does not weigh in favor of a preliminary injunction.

## IV. CONCLUSION

This Court's analysis is constrained by the preliminary record, and the facts discussed above do not represent factual findings for any purpose other than the resolution of the instant motion. Similarly, the Court's ruling is not a predictor as to the likelihood that either party will ultimately prevail in this case, as further factual development will likely dictate the final resolution. The preliminary injunction standard not having been met, the Court finds that an injunction should not issue at this early stage of the proceedings.

Based on the detailed analysis above, the Court **DENIES** Plaintiff's motion seeking preliminary injunction.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to all counsel of record.

It is so **ORDERED**.

/s/ _____

Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
October 21 , 2013

57